UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT G. DREWS,

       Plaintiff,

v.                                               Case No. 13-10421

AMERICAN AIRLINES, INC.,          HON. TERRENCE G. BERG

       Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. 27) AND DEFENDANT'S MOTION TO STRIKE
PLAINTIFF'S FIRST AMENDED WITNESS LIST (DKT. 33)**

      This case involves a slip and fall on an airline jetway. Plaintiff Robert G. Drews filed suit against Defendant American Airlines, Inc. on February 1, 2013 alleging that Defendant was negligent in failing to warn Plaintiff as he was boarding a flight at Chicago O'Hare Airport in Chicago, Illinois that the jet bridge was slippery with deicing solution spilled by Defendant's employees. (Dkt. 1, p. 2.) Plaintiff claims that he sustained severe injuries as a direct and proximate result of Defendant's negligence when Plaintiff slipped and fell on the jet bridge. (*Id.*) Defendant has moved for summary judgment on Plaintiff's claim. (Dkt. 27.) The motion was fully briefed and oral argument was heard on July 16, 2014.

      Defendant has also moved to strike Plaintiff's July 20, 2014 First Amended Witness List (Dkt. 33) in its entirety because Plaintiff added two witnesses, Drs. Robert Carson and Steven Anderson, after the close of discovery. (*Id.* at 7, 11.) As a result, Defendant has not had an opportunity to depose the new witnesses or

conduct other discovery. Plaintiff offers the explanation that he added these new witnesses because Plaintiff's treating physician suffered a debilitating stroke, leaving him unable to be deposed or to testify at trial. (Dkt. 33, p. 3.) Without a treating physician to testify regarding Plaintiff's wrist injury and treatment, Plaintiff would be significantly prejudiced.

After careful review and consideration of the pleadings, supporting briefs and oral arguments, the Court finds that there are disputed issues of material fact regarding Plaintiff's premises liability claim. With respect to Defendant's motion to strike Plaintiff's entire amended witness list, the Court will deny the motion but extend the discovery period for 45 days from the date of this Order as to Drs. Carson and Anderson only for the limited purpose of taking their depositions and requesting any relevant medical records. Therefore, Defendant's Motion for Summary Judgment (Dkt. 27) and its Motion to Strike Plaintiff's Late First Amended Witness List (Dkt. 32) will both be DENIED.

## I.   FACTUAL BACKGROUND

As a preliminary matter, the Court notes that Plaintiff did not follow the type size requirement specified in local rule 5.1(a)(3) (no type size smaller than 14 point) or the Court's practice guidelines for a response to a motion for summary judgment that are available on the Court's website. These practice guidelines provide as follows:

> A Rule 56 motion must begin with a "Statement of Material Facts." Such a Statement is to be included as the first section of the Rule 56 Motion. The Statement must consist of separately numbered paragraphs briefly

> describing the material facts underlying the motion, sufficient to support judgment. Proffered facts must be supported with citations to the pleadings, interrogatories, admissions, depositions, affidavits, or documentary exhibits. Citations should contain page and line references, as appropriate.... The Statement of Material Facts counts against the page limit for the brief. No separate narrative facts section shall be permitted.
>
> The response to a Rule 56 Motion must begin with a "Counter-statement of Material Facts" stating which facts are admitted and which are contested. The paragraph numbering must correspond to moving party's Statement of Material Facts. If any of the moving party's proffered facts are contested, the non-moving party must explain the basis for the factual disagreement, referencing and citing record evidence. Any proffered fact in the movant's Statement of Material Facts that is not specifically contested will, for the purpose of the motion, be deemed admitted. In similar form, the counter-statement may also include additional facts, disputed or undisputed, that require a denial of the motion.[1]

Plaintiff's response included a separate narrative fact section in violation of the Court's practice guidelines. While Defendants' "Statement of Facts" was organized in separately numbered paragraphs, Plaintiff's response omitted the "Counter-statement." Without a statement and counter-statement, the parties fail to identify clearly which material facts are subject to dispute.[2] The Court nonetheless conducted a thorough review of parties' briefs, oral arguments, and exhibits and gleaned the following facts, which are viewed in a light most favorable to Plaintiff as the non-moving party.

**A. Defendant's Motion for Summary Judgment**

On January 27, 2012, Plaintiff Robert G. Drews and his wife Roberta Drews were returning from Hawaii to Michigan on an American Airlines flight with a

---

[1] Available at -- http://www.mied.uscourts.gov/Judges/guidelines/topic.cfm?topic_id=459
[2] *See, e.g., Akines v. Shelby Cnty. Gov't*, 512 F. Supp. 2d 1138, 1147 (W.D. Tenn. 2007) (deeming the Defendant's statement of undisputed material facts as having been admitted by the Plaintiffs, where the Plaintiffs failed to file a counter-statement of material facts, as directed by local rule).

connection in Chicago. (Dkt. 27, Ex. 1, pp. 45-49.) Both passengers and some airline employees indicated that, on the jetway leading to the aircraft of the connecting flight from Chicago O'Hare International Airport in Chicago, Illinois, to Bishop International Airport in Flint, Michigan, there was some kind of a clear liquid present on the floor during the boarding process. (Dkt. 27, Ex. 11, pp. 32:3-33:14, 39-41; Dkt. 27, Ex. 22.)

The captain of that flight, Michael Melchior, testified that the liquid on the jetway floor was deicer fluid, and was located in the area near the entrance of the aircraft, between the service door and the jetway extender. (*Id.* at pp. 31:12-33:14.) Captain Melchoir thought that the deicer fluid had been tracked onto the jetway, but he did not know by whom. (*Id.* at pp. 33:22-34:11.) Captain Melchior noted in his incident report that the "plastic ramp where the jet bridge retracts into itself [was] slick due to deice fluid tracked from the ramp." (Dkt. 27, Ex. 22.)

During the boarding process, Captain Melchoir walked up the jetway to use the restroom in the terminal and then back down the jetway to the airplane. (*Id.*) Prior to boarding, First Officer Yann Wuchterl completed a pre-flight check of the exterior of the aircraft that required him to walk from inside the plane out onto the jetway and then through the service door. (Dkt. 27, Ex. 20, p. 78:5-25.) After approximately ten minutes, First Officer Wuchterl returned to the plane's flight deck through the service door and the jetway as passengers were boarding. (*Id.* at 27:12-28:24.) Neither had difficulty walking on the jetway (Dkt. 27, Ex. 11, p. 68:4-15; Dkt. 27, Ex. 20, pp. 78:20-79:1), but Captain Melchoir noticed fluid by the

3

service door upon his return to the plane (Dkt. 27, Ex. 11, pp. 67:12-68:12). A passenger informed Captain Melchoir as he returned to the plane that "people were slipping and falling in the jet bridge" (Dkt. 27, Ex. 22).

A passenger also told flight attendant Donna Valdez, who was standing just inside the aircraft entrance while passengers were boarding, that passengers were falling in the jetway. (Dkt. 27, Ex. 19, pp 14:7-15:5, 20:19-21.) Although Valdez could see the short segment of the jetway that met the door of the airplane, she herself did not see anyone fall in that area. (*Id.* at 16:4-12, 20:19-21, 29:1-30:4.) According to Valdez, approximately 12 to 15 people had boarded when she first learned that passengers were slipping. (*Id.* at 20:12-16.) Valdez then shared that information with Captain Melchoir. (*Id.* at pp. 14-15.) In addition, First Officer Wuchterl was making "repeated calls" from the flight deck to "[Operations] of the slippery situation." (Dkt. 27, Ex. 22; Ex. 21, 41:4-43:16.) While Captain Melchoir was notifying a baggage handler of the problem, yet another passenger slipped. (*Id.*) As a result, Captain Melchoir advised the gate agent to discontinue boarding until the jetway was cleaned. (*Id.*)

Seven passengers total "made mention of slipping" including Plaintiff. (*Id.*) At some point while boarding, Plaintiff slipped in an area he described as "about midway in the jetway." (Dkt. 28, Ex. V at 76:16-23.) Plaintiff's wife was somewhere behind him on the jetway and he could see the door of the airplane. (*Id.* at 57:22-59:21.) During his deposition, Plaintiff testified that he fell "instantaneously" on one of the connector ramps of the jetway floor where the surface is sloped and uneven.

4

(*Id.* at 77:8-79:12.) According to Passenger Service Supervisor Calvin Lewis, this floor segment is a section of the jetway that expands and retracts. (Dkt. 27, Ex. 16, pp. 74-76.) Plaintiff only recalls "putting [his] left foot forward, it slipping out from underneath [him], and [he] was down." (Dkt. 28, Ex. V at 79:23-24.)

After Plaintiff's slip, Plaintiff's wife and an unidentified passenger helped him up. (Dkt. 28, Ex. V at 82:6-25.) According to Plaintiff's wife, that unidentified passenger told them that the jetway floor was very slippery, and other passengers had fallen. (Dkt. 27, Ex. 21 at 10:8-12:5.) Plaintiff "complained of a sore knee and forearm" but initially refused medical attention. (Dkt. 27, Ex. 22.) Plaintiff testified that once he and his wife arrived in Flint, a member of the flight crew approached Plaintiff and said "Sir, I'm sorry, this should have never happened. One of the ground crew tracked deicer up into the jetway." (Dkt. 28, Ex. V at 88:16-24.) As a result of this slip, Plaintiff claims he permanently injured his right wrist and right hip. (Dkt. 1, ¶¶ 11-12.)

**B. Defendant's Motion to Strike Plaintiff's Amended Witness List**

On February 24, 2012, Dr. Jeffrey Gorosh, assisted by Dr. Robert Carson treated a torn ligament in Plaintiff's right wrist by removing tissue from the scapholunate ligament and synovial joint, and administering a corticosteroid injection. (Dkt. 34, Ex. C.) Dr. Steven Anderson assisted Dr. Gorosh on March 30, 2012, with the performance of a SLAC reconstruction or four-corner fusion of Plaintiff's right wrist to treat the ligament injury. (Dkt. 34, Ex. D.) Subsequent

5

follow-up evaluations revealed that Plaintiff had developed acute carpal tunnel syndrome. (Dkt. 33, Ex. 3, p. 6.)

At some point after Dr. Gorosh treated Plaintiff, he suffered a debilitating stroke that prevents him from being deposed or from testifying at trial.[3] Defense counsel became aware of this unfortunate event early in the discovery period (Dkt. 33, p. 3), but Plaintiff's counsel did not learn of it until "on or about May 2014" (Dkt. 34, p. 2). Discovery in this matter ended on June 6, 2014. (February 13, 2014 text-only order.) Plaintiff requested a discovery extension on May 27, 2014 but Defendant did not agree. (Dkt. 33, p. 4.) On July 10, 2014, Plaintiff filed his First Amended Witness List naming Drs. Carson and Anderson as witnesses in lieu of Dr. Gorosh. (Dkt. 32.) On July 23, 2014, Defendant moved to strike Plaintiff's amended witness list in its entirety as untimely and prejudicial. (Dkt. 33, pp. 7, 11.)

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith*

---

[3] Although the record does not disclose the date on which Dr. Gorosh suffered his stroke, it presumably occurred at some point after August 14, 2012, the date of his most recent report to Plaintiff's counsel detailing Plaintiff's recovery. (Dkt. 33, Ex. 3, p. 6.)

*Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### III.   ANALYSIS

**A. Defendant's Motion for Summary Judgment**

Defendant has moved for summary judgment on Plaintiff's premises liability claim (Dkt. 27). Under Michigan law, which governs this diversity action, a Plaintiff

asserting a premises liability claim must prove four elements: (1) that defendant owed a duty to Plaintiff, (2) that Defendant breached that duty, (3) that Plaintiff suffered damages, and (4) that the breach was the cause of the damages suffered. *Demo v. Red Roof Inns, Inc.*, 274 F. App'x 477, 478 (6th Cir. 2008) (quoting *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993)).

Here, Defendant challenges Plaintiff's claim on three of the four premises liability elements: duty, breach, and causation. First, regarding duty, Defendant concedes that there was fluid identified as deicer on the jetway at the time Plaintiff slipped (Dkt. 27, ¶¶ 19-22), but argues that Plaintiff can only speculate as to why he slipped because he has not offered any evidence showing fluid was found at the specific location on the jetway where he claims he fell (*Id.* at 12). Defendant asserts instead that Plaintiff slipped on a sloped connector ramp: an open and obvious danger from which it had no duty to protect Plaintiff. (*Id.* at 21.) Second, as to breach, even if Defendant owed a duty to Plaintiff, Defendant maintains that it did not breach that duty because there is no evidence that it created the hazardous condition of fluid on the jetway or had actual or constructive knowledge of it. (*Id.* at 16.) Third, concerning causation, even if Defendant breached a duty owed to Plaintiff, there is no evidence that its breach caused Plaintiff's injuries. (*Id.* at 16-20.) Because the available evidence gives rise to questions of material fact pertaining to each of Defendant's assertions, summary judgment will be denied.

### a. Duty

Under Michigan law, the party responsible for premises "owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition." *Lugo v. Ameritech Corp.*, 629 N.W.2d 384, 386 (Mich. 2001). An invitor, however, need not guarantee its invitee's absolute safety. *See Riddle v. McLouth Steel Prods. Corp.*, 485, N.W.2d 676, 679 (Mich. 1992). Indeed, an invitor owes no duty to protect or warn an invitee of a dangerous condition that is open and obvious unless there are special aspects to that condition that "make even an open and obvious risk unreasonably dangerous." *Lugo*, 629 N.W.2d at 386.

Defendant analogizes the instant case to *Njoku v. Northwest* where the Court found that the steel plate on which the Plaintiff slipped while exiting a plane at Detroit Metropolitan Airport was open and obvious and therefore the Defendant owed no duty of care.[4] 806 F. Supp. 2d 1022, 1029 (E.D. Mich. 2011). Defendant claims that because Plaintiff cannot prove that the deicer fluid in the jetway was located exactly where Plaintiff claims he slipped, Plaintiff must have slipped on the sloping connector ramp instead. (Dkt. 27, p. 21.) Defendant claims it owed no duty of care to Plaintiff because the grade of the connector ramp, like the steel plate in *Njoku*, "was open and obvious to an ordinary observer upon casual inspection." (Dkt. 27, p. 21.)

---

[4] The facts in *Njoku* are quite different from this case. In *Njoku*, only the Plaintiff fell and was injured on the jetway and no one claimed to have noticed a foreign substance in the vicinity. 806 F.Supp.2d at 1024. Here, Defendant admits that other passengers slipped or fell on the jetway where at least one of its employees noticed fluid. (Transcript 3:22-4:5, 22:23- 23:23.)

9

A trier of fact could still find Defendant liable even if the jetway's slippery or uneven condition is open and obvious. A reasonable juror could infer, for example, that the jetway's slippery surface is not an open and obvious danger because such a circumstance is not an everyday occurrence. In the *Lugo* case, cited by Defendant, the Michigan Supreme Court held that a pothole in the middle of a parking lot was an open and obvious dangerous condition because such potholes are an "everyday occurrence." 369 N.W.2d at 389. Unlike potholes, the Sixth Circuit held in *Matteson v. Northwest Airlines, Inc.*, an unpublished opinion cited by Plaintiff, that "a clear spill on an airport floor is not" open and obvious because it is not "'the type of everyday occurrence that people regularly encounter."[5] 495 F. App'x 689, 693 (6th Cir. 2012).

Even if a reasonable juror finds that the jetway's slippery or uneven surface is open and obvious, such a juror can still infer that special aspects of the condition create an unreasonable risk of harm. *See Lugo*, 629 N.W.2d at 387–88. In *Lugo*, the Michigan Supreme Court noted that a commercial building with standing water on the floor and only one exit for the general public would be a circumstance where liability could still be imposed because the open and obvious condition would be "effectively unavoidable" given that "a customer wishing to exit the store must leave the store through the water." *Id.* at 387. Similarly, a reasonable juror could find that, like the standing water in the *Lugo* Court's example, deicer fluid or the

---

[5] In *Matteson*, a Northwest Airlines passenger slipped and fell on a clear, thick fluid on tile flooring at the Detroit Metropolitan Airport, breaking her right hip and injuring her right rotator cuff. 495 F. App'x at 689. Like Plaintiff, Matteson stated that she was "just walking looking ahead" but "then all of a sudden [she was] down." *Id.*

10

uneven surface of the jetway were effectively unavoidable because passengers were required to walk up the jetway to board the plane.

### b. Breach

To establish breach of duty in a Michigan premises liability case, a Plaintiff must show that the Defendant: (1) created the dangerous condition; (2) knew of the dangerous condition; or (3) should have known of the dangerous condition. *See Berryman v. K-Mart Corp.*, 483 N.W.2d 642, 645 (1992); see also *Pritchard v. Northwest Airlines, Inc.*, 111 F. App'x 406 (6th Cir. 2004) ("[A] property owner is liable for an unsafe condition only if the owner or his agent caused the condition or knew or should have known of the condition.").

Defendant relies on *Pritchard,* arguing that Plaintiff has not provided enough evidence for a reasonable juror to infer that Defendant caused the dangerous condition on the jetway or knew or should have known about the condition. (Dkt. 27, pp. 16-17.) In *Pritchard*, the Plaintiff slipped on snow that was blown into the jetway through a gap between the jetway and the airplane. 111 F. App'x at 407-08. The Court found that the Plaintiff failed to present sufficient evidence to permit a reasonable inference that the Defendant created the dangerous condition or had notice of it because: (1) there is always a gap between the jetway and the plane therefore snowy weather created the dangerous condition; and (2) the snow had not been in the jetway long enough to infer that the Defendant should have discovered it. *Id.* at 409-10. Defendant argues that, as in *Pritchard*, Plaintiff cannot show that

11

Defendant knew about or caused the dangerous condition; Plaintiff can only speculate about how long the fluid was allegedly on the jetway. (Dkt. 27, p. 17.)

Unlike in *Pritchard*, however, Plaintiff here offers sufficient evidence to create a jury question as to whether Defendant's employees created the dangerous condition and whether Defendant had actual knowledge of it. First, Defendant's employee testified that service workers tracked deicer fluid into the jetway. Captain Melchior stated in his incident report that the jetway was "slick due to deice fluid tracked from the ramp." (Dkt. 27, Ex. 22.) Second, both Plaintiff and his wife testified that a man who appeared to be a crew member or pilot approached them and explained that "[o]ne of the grounds crew tracked deicer up into the jetway." (Dkt. 28, Ex. V, p. 88; Dkt. 27, Ex. 21, p. 21.)

There is also evidence that Defendant had actual knowledge of the dangerous condition. Defendant concedes that its employees were notified by passengers that several passengers had slipped in the jetway during boarding. (Dkt. 27, pp. 1-9, ¶¶ 25, 26, 47-50.) In addition, Plaintiff's wife testified that as she was approaching her husband in the jetway, a male passenger said "be careful, that's very slippery there, multiple people have fallen." (Dkt. 27, Ex. 21, pp. 10-11.) As a result of passengers falling, boarding was eventually stopped so that the jetway could be cleaned. (Dkt. 27, Ex. 22.) When viewed in the light most favorable to Plaintiff, a reasonable jury could infer that Plaintiff fell after Defendant's employees had either seen or had been notified of the dangerous condition on the jetway.

### c. Causation

Under Michigan law, a court may decide causation as a matter of law if a Plaintiff presents insufficient evidence to support "a reasonable inference" of causation. *Demo,* 274 F. App'x at 478 (quoting *Weymers v. Khera*, 563 N.W.2d 647, 648 (1997)). A Plaintiff cannot satisfy the burden of drawing "a reasonable inference of causation" by merely speculating that the Defendant may have caused a Plaintiff's injuries. *Id.* Moreover, "[t]he mere occurrence of plaintiff's fall is not enough to raise an inference of negligence on the part of the defendant." *Stefan v. White*, 257 N.W.2d 206, 210 (Mich. Ct. App. 1977).

Defendant relies primarily on *Demo* and *Stefan* for the proposition that Plaintiff can only survive summary judgment if he proffers more than "mere speculation or conjecture" about what caused his fall. (Dkt. 27, p. 12.) The *Stefan* Plaintiff, who fell down a flight of stairs, explained during her deposition that she "just went down" and "didn't feel nothing" that could have caused the fall. *Id.* at 208. Although her husband filed an affidavit pointing to a metal strip at the top of the stairs as a probable cause of the fall, the Court found the Plaintiff had not offered enough evidence to raise a reasonable inference of causation. *Id.* at 210. Similarly, in *Demo,* the Plaintiff testified that he "just took off falling" down a flight of stairs. 274 F. App'x at 479. The *Demo* Court found that the Plaintiff's speculative deposition testimony about what caused his fall and an accident report the Plaintiff filed citing wet and icy stairs were insufficient to establish a genuine causation question. *Id.* at 478-79.

13

While Plaintiff in this case seems unsure of where precisely he fell and could only testify to "putting [his] left foot forward, it slipping out from underneath [him], and [he] was down," Plaintiff has supplemented his account with sufficient additional evidence to support a reasonable inference of causation. (Dkt. 27. Ex. 1, p. 79.) Captain Melchior testified that there was a clear liquid, which he assumed was deicer fluid, present on the jetway floor on the day of the incident. (Dkt. 27, Ex. 11, pp. 31, 39, 87.) Captain Melchior added that "people were slipping and falling in the jet bridge" and described the slippery area as a "plastic ramp where the jet bridge retracts into itself" that was "slick due to deice fluid tracked from the ramp." (Dkt. 27, Ex. 22.) Similarly, Lewis stated in his incident report that "five passengers had fallen on the jetbridge while boarding." (Dkt. 27, Ex. 23.) Unlike the report in *Demo* or the affidavit in *Stefan*, these accounts did not originate from Plaintiff or his spouse.

Defendant responds to this evidence by again claiming that it does not show that the liquid was located *exactly* where Plaintiff claims he slipped. (Dkt. 27, pp. 14-15.) Defendant points to Captain Melchior's testimony indicating that the liquid was located in the area right in front of the entrance of the airplane (Dkt. 28, Ex. 11, pp. 31-33), and compares it to Plaintiff's testimony indicating that he fell "about midway" through the jetway (Dkt. 27, Ex. 1, p. 76). (Dkt. 27, pp. 14-15.) In addition, Defendant notes that Valdez testified that while she was standing in the entrance of the airplane during boarding, she did not see anyone fall – although she was

informed that at least one passenger had fallen (Dkt. 27, Ex. 19, pp. 34-35). (Dkt. 27, pp. 14-15.)

Viewing the evidence in the light most favorable to Plaintiff, however, there is support for a reasonable inference that the deicer fluid was located where Plaintiff claims he fell in the jetway. First, there are similarities between the description of the area slick with deicer fluid and the description of the area where Plaintiff believes he fell. Captain Melchior testified that he saw a clear liquid, which he assumed was deicer fluid, present on the jetway floor on the day of the incident. (Dkt. 27, Ex. 22.) Captain Melchior described the slippery area as a "plastic ramp where the jet bridge retracts into itself" that was "slick due to deice fluid tracked from the ramp." (*Id*.) Similarly, Plaintiff described the area where he slipped as a connector ramp with "a little plastic section" where the surface is sloped and uneven. (Dkt. 28, Ex. V, pp. 78:6-13.) Like Captain Melchoir, Lewis described this same area as a section of the jetway that can expand and retract. (Dkt. 27, Ex. 16, pp. 74-76.)

Even if Plaintiff, Captain Melchoir, and Lewis were describing different sections of the jetway, a reasonable juror could infer that the fluid Defendant locates near the aircraft entrance (Dkt. 27, ¶¶ 20, 27) had been tracked to a point farther down the jetway by the time Plaintiff boarded. First Officer Wuchterl stated that prior to boarding he used the jetway to access the service door outside so that he could complete his pre-flight check of the airplane's exterior. (Dkt. 27, Ex. 20, pp. 15:20-16:11.) He returned after ten minutes to the flight deck inside the airplane

15

through the service door and the jetway as passenger boarding was beginning. (*Id.* at 28:20-24.) Meanwhile, Captain Melchoir walked down the jetway into the terminal, through the area where he saw the deicing fluid, to use the restroom and then returned to the plane by walking back up the jetway as boarding began. (Dkt. 27, Ex. 22.) Valdez stated that the first 12-15 passengers boarded without incident. (Dkt. 27, Ex. 19, pp 20:12-16.) This testimony raises a factual question as to whether fluid had been transferred from the service door area to the middle of the ramp, where Plaintiff believes he fell.

Furthermore, seven passengers claimed to have fallen in the jetway while boarding. (Dkt. 27, Ex. 22.) If the fluid was only located where Defendant maintains it was, the passengers were more likely to have fallen in that same area near the airplane entrance. Valdez, however, standing in the airplane entrance with a view of that final short portion of the jetway, testified that she did not see anyone fall there. (Dkt. 27, Ex. 19, pp. 16:4-12, 20:19-21, 29:1-30:4.) A reasonable juror could therefore infer that at least some of those seven passengers must have fallen further back towards the terminal and that fluid was thus likely elsewhere on the jetway outside of Valdez's view.

Plaintiff is therefore not merely speculating; he has provided additional evidence relevant to causation from sources including Defendant's own employees. Because the Court must draw all reasonable inferences in favor of Plaintiff, the factual disputes raised by the evidence concerning exactly where the fluid was

located on the jetway, where precisely Plaintiff fell, and whether the fluid caused his fall must be left for the jury to decide. Summary judgment is not appropriate.

**B. Defendant's Motion to Strike Plaintiff's First Amended Witness List**

Defendant has also moved to strike Plaintiff's First Amended Witness List (Dkt. 33) as untimely and because Plaintiff's failure to identify Drs. Carson and Anderson prior to the close of discovery is prejudicial to Defendant. (Dkt. 33, pp. 7, 11.) Defendant claims that it has not had the opportunity to subpoena Dr. Carson or Dr. Anderson's records, to depose them, or otherwise conduct necessary discovery at to these two new witnesses. (*Id.* at 8-9.) Plaintiff argues that there are no additional medical records to subpoena because, as Dr. Gorosh's assistants, Dr. Carson and Dr. Anderson did not maintain independent records of Plaintiff's treatment. (Dkt. 34, p. 11.)

As Defendant notes, Plaintiff's wrist injury is a key component of his claim. (*Id.* at 8). Plaintiff's treating physician for his wrist injury, Dr. Gorosh, was named on Plaintiff's first witness list (Dkt. 12) but subsequently suffered a debilitating stroke that has left him unable to be deposed or to testify at trial. (Dkt. 33, p. 3.) Plaintiff sought an extension of the discovery period but Defendant refused. (*Id.* at 4.) As a result, Plaintiff filed an amended witness list after the close of discovery naming Drs. Carson and Anderson as witnesses in lieu of Dr. Gorosh. (Dkt. 32.) Drs. Carson and Anderson, according to Plaintiff, have direct knowledge of Plaintiff's treatment because they assisted Dr. Gorosh and were present during Plaintiff's procedures. (Dkt. 34, p. 2.)

17

Defendant's motion to strike Plaintiff's First Amended Witness List is not well taken. (Dkt. 33.) District courts have broad discretion under the rules of civil procedure to manage the discovery process and control their dockets. *Marie v. Am. Red Cross*, No. 13-4052, 2014 WL 5905003, at *17 (6th Cir. Nov. 14, 2014) (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1338 (6th Cir. 1992)). Dr. Gorosh's health is beyond Plaintiff's control. Without a treating physician to testify to his wrist condition and treatment, Plaintiff is significantly prejudiced. It is equally true, however, that Defendant has not had an opportunity to depose either Drs. Carson or Anderson, or to seek discovery of their relevant medical records. In fairness to both parties, the Court will therefore deny Defendant's motion to strike but will re-open discovery for 45 days from the date of this Order as to Drs. Carson and Anderson for the limited purpose of allowing their depositions to be taken and requesting any relevant medical records.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Dkt. 27) is **DENIED**. Defendant's Motion to Strike Plaintiff's Late First Amended Witness List (Dkt. 33) is also **DENIED**. It is **ORDERED**, however, that the discovery period be extended for 45 days from the date of this Order as to Plaintiff's witnesses Dr. Robert Carson and Dr. Steven Anderson only.

**SO ORDERED**.

s/Terrence G. Berg  
TERRENCE G. BERG  
UNITED STATES DISTRICT JUDGE

Dated: December 18, 2014

**Certificate of Service**

I hereby certify that this Order was electronically submitted on December 18, 2014, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb<br>Case Manager